IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ALBERT F. VERGARA,
*Appellant*.

No. 2 CA-CR 2023-0081
Filed March 26, 2025

---

Appeal from the Superior Court in Pima County
No. CR20211250001
The Honorable Javier Chon-Lopez, Judge

**AFFIRMED**

---

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson
*Counsel for Appellee*

Megan Page, Pima County Public Defender
By Erin K. Sutherland, Assistant Public Defender, Tucson
*Counsel for Appellant*

---

**OPINION**

Vice Chief Judge Eppich authored the opinion of the Court, in which Presiding Judge Kelly and Chief Judge Staring concurred.

---

E P P I C H, Vice Chief Judge:

¶1        Albert Vergara appeals from his convictions and sentences for kidnapping, sexual assault, and aggravated assault with a deadly weapon or dangerous instrument.  He asserts the trial court erred by denying his motion to dismiss the charges against him as time-barred by the statute of limitations.  He also contends the court committed reversible error by permitting the state to introduce evidence that his DNA profile was in a database, which, he alleges, implied he had a prior criminal history.  For the following reasons, we affirm.

**Factual and Procedural Background**

¶2        We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all reasonable inferences against Vergara.  *See State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022).  Early in the morning on December 21, 1991, T.M. left her home to walk to work.  As she was walking, she noticed a man, later identified as Vergara, at the end of the street.  Vergara began to jog toward T.M., and when she moved out of the way for him to pass, he grabbed her arm and pulled her into the nearby desert.  Vergara had a weight in his hand that was large enough to kill or knock T.M. unconscious, and he threatened her with it.  Vergara pulled T.M. to the ground, and she resisted as he tried to remove her pants.  When T.M. screamed, Vergara punched her in the face.  Vergara then penetrated T.M.'s vulva with his penis.

¶3        After Vergara finished assaulting T.M., he left, threatening to kill T.M. if she moved.  T.M. waited awhile and then ran home, where her mother called the police.  The police took T.M. to the emergency room, and medical staff conducted a sexual assault examination which included taking swabs from T.M.'s vagina.  Police generated a sketch from T.M.'s description but were unable to identify a suspect, and the case went "cold."

¶4        In 2015, the police department received a grant to process cold case sexual assault kits.  T.M.'s kit was selected for testing, and, in 2018, DNA from T.M.'s vaginal swab was developed into a profile "consistent with a mixture of two individuals, including a major male contributor and alleles consistent with [T.M.]."  On December 6, 2018,[1] the male contributor "hit to a database," identifying Vergara as a possible suspect.  A detective

_____

[1]The parties do not dispute this date, which the trial court used to consider Vergara's motion to dismiss.

later obtained Vergara's DNA using buccal swabs, the profile of which matched the male profile obtained from T.M.'s vaginal swabs.

**¶5** On April 20, 2021, Vergara was indicted for kidnapping, aggravated assault with a deadly weapon or dangerous instrument, and sexual assault. After a trial in which the jury could not reach a verdict, the court declared a mistrial. Vergara was retried before another jury and found guilty as charged. The court sentenced him to concurrent terms of imprisonment, the longest of which is twenty-eight years. This appeal followed. We have jurisdiction pursuant to article VI, § 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

### Time-barred Prosecution

**¶6** Before trial, Vergara moved to dismiss the charges against him, which the trial court denied. Vergara argues the trial court erred because the statute of limitations barred his prosecution. He alternatively asserts that if his prosecution for sexual assault was not time-barred, his prosecutions for kidnapping and aggravated assault were because the statute of limitations was merely tolled and he is entitled to credit for the nearly six years between the date of the offense and the effective date of the amendment. We review for an abuse of discretion the denial of a motion to dismiss, but we review de novo issues of statutory interpretation. *State v. Aguilar*, 218 Ariz. 25, ¶¶ 14-15 (App. 2008) (whether statute of limitations applies is question of law).

**¶7** In his dismissal motion, Vergara argued that because the version of A.R.S. § 13-107 in effect in 1991 when he committed the offenses barred prosecution of those offenses after seven years, *see* 1985 Ariz. Sess. Laws, ch. 223, § 1, the state was prohibited from pursuing the prosecution in 2021, over twenty-two years after the expiration of the 1991 statute of limitations. In *State v. Gum*, 214 Ariz. 397, ¶¶ 13, 29 (App. 2007), and *Aguilar*, 218 Ariz. 25, ¶¶ 22, 26, we determined that a 1997 amendment to § 13-107, at a minimum, tolled the statute of limitations for "serious offense[s]" in which the offender was unknown, *see* 1997 Ariz. Sess. Laws, ch. 135, § 1, so long as the initial limitations period had not yet expired when the amendment became effective.[2] But Vergara argued *Gum* and *Aguilar* were incorrectly decided based on our supreme court's opinion in

---

[2]Vergara's identity was not discovered until 2018, and his crimes constituted "serious offense[s]" under the 1997 amendment. *See* 1997 Ariz. Sess. Laws, ch. 135, § 1; 1997 Ariz. Sess. Laws, ch. 34, § 1.

*Martin v. Superior Court*, 135 Ariz. 99 (1983), and our court's opinions in *Taylor v. Cruikshank*, 214 Ariz. 40 (App. 2006), and *State v. Escobar-Mendez*, 195 Ariz. 194 (App. 1999). Alternatively, he argued, even if the statute of limitations was tolled, the prosecution was still untimely.

¶8 At the conclusion of a hearing, the trial court stated it was "not willing to say that [our court had] incorrectly decided" *Gum* and *Aguilar*. Because the statute of limitations had not expired in Vergara's case when the 1997 amendment became effective, and because his identity was not discovered until December 6, 2018, the court concluded the state's commencement of the prosecution on April 6, 2021 was timely. Additionally, the court found the plain language of the 1997 amendment did not toll the limitations period but, rather, the limitations period did not begin to run until the identity of the perpetrator was discovered; therefore, prosecution of Vergara for all of the charged offenses was not time-barred. On appeal, Vergara largely re-asserts these arguments.[3]

## I. Statute of Limitations

¶9 "Statutes of limitation in criminal cases are designed primarily to protect the accused from the burden of defending himself against charges of long completed misconduct." *Martin*, 135 Ariz. at 100 (quoting *State v. Fogel*, 16 Ariz. App. 246, 248 (1972)). Criminal statutes of limitations are not merely a "limitation upon the remedy, but a limitation upon the power of the sovereign to act against the accused." *Id.* (quoting *Fogel*, 16 Ariz. App. at 248); *see also Escobar-Mendez*, 195 Ariz. 194, ¶ 13 (criminal statutes of limitations are jurisdictional). "No statute is retroactive unless expressly declared therein," A.R.S. § 1-244, and we construe statutes of limitations "liberally in favor of the accused and against the prosecution," *Escobar-Mendez*, 195 Ariz. 194, ¶ 13.

¶10 In 1991, when Vergara committed the offenses against T.M., § 13-107(B) provided, in relevant part, that prosecutions for sexual assault, aggravated assault with a deadly weapon or dangerous instrument, and kidnapping "must be commenced" within seven years after "actual discovery by the state or the political subdivision having jurisdiction of the

---

[3]Vergara has abandoned his argument that the sexual assault prosecution was untimely based on his theory that the 1997 amendment tolled rather than extended the statute of limitations—he solely argues it was untimely because at the time of his prosecution, the 1991 limitation period had expired.

offense or discovery by the state or such political subdivision which should have occurred with the exercise of reasonable diligence, whichever first occurs." 1985 Ariz. Sess. Laws, ch. 223, § 1; *see also* 1989 Ariz. Sess. Laws, ch. 199, § 1 (sexual assault); 1990 Ariz. Sess. Laws, ch. 152, § 1 (aggravated assault with deadly weapon or dangerous instrument); 1985 Ariz. Sess. Laws, ch. 364, § 15 (kidnapping). "[A] prosecution is commenced when an indictment . . . is filed." 1985 Ariz. Sess. Laws, ch. 223, § 1.

¶11 Effective July 21, 1997, the legislature amended § 13-107 and added subsection (E) which provides, "The period of limitation does not run for a serious offense . . . during any time when the identity of the person who commits the offense or offenses is unknown." 1997 Ariz. Sess. Laws, ch. 135, § 1; *see Gum*, 214 Ariz. 397, n.5 (effective date). Sexual assault, aggravated assault with a dangerous weapon or dangerous instrument, and kidnapping are "serious offense[s]" under § 13-107(E). *See* 1997 Ariz. Sess. Laws, ch. 34, § 1. In 2001, the legislature again amended the statute to provide that a prosecution for sexual assault "may be commenced at any time." *See* 2001 Ariz. Sess. Laws, ch. 183, § 1.

¶12 On appeal, the parties agree that T.M. reported Vergara's crimes immediately, and, therefore, under the version of § 13-107(B) in effect at the time, the state actually discovered Vergara's offenses on December 21, 1991. *See* 1985 Ariz. Sess. Laws, ch. 223, § 1; *State v. Jackson*, 208 Ariz. 56, ¶¶ 28, 30 (App. 2004) (limitations period in § 13-107(B) begins to run "when the authorities know or should know in the exercise of reasonable diligence that there is probable cause to believe a criminal [offense] has been committed" (alteration in *Jackson*) (quoting *State v. Wilson*, 573 N.W.2d 248, 254 (Iowa 1998))). At that time, the statute of limitations would have expired on December 21, 1998. *See Taylor*, 214 Ariz. 40, ¶¶ 18-19, 23, 28 (limitations period begins to run from discovery of offense, not offender, in pre-1997 version of § 13-107). The parties dispute, however, whether the 1997 amendment to § 13-107 applies to Vergara's case since his identity was not discovered until December 2018. *See* 1997 Ariz. Sess. Laws, ch. 135, § 1 (limitations period for serious offenses "does not run" while the perpetrator's identity is unknown). As explained below, the 1997 amendment applies.

## A. Overview of applicable Arizona case law

¶13 In 1983, our supreme court considered retroactive application of an amendment to a criminal statute of limitations in *Martin*. 135 Ariz. at 99-100 (considering A.R.S. § 13-106 which later became § 13-107). The defendant, Martin, had allegedly committed six felony counts of lewd and

lascivious acts on various dates between June 1973 and May 1977. *Id.* at 99 & n.1. At that time, the statute of limitations provided that a prosecution for a felony must be commenced within five years. *Id.* at 99-100. But effective October 1, 1978, as part of the new criminal code, the statute was amended, extending the relevant limitations period to seven years. *Id.* Martin was indicted in September 1982. *Id.* at 99.

**¶14** Martin argued his prosecution was barred because the statute of limitations in effect at the time of his alleged crimes had expired by the time he was indicted. *Id.* at 100. The state countered that the 1978 amendment extended the statute of limitations for all alleged offenses for which the five-year period had not yet run as of the amendment's effective date. *Id.*

**¶15** Our supreme court held Martin's prosecution was barred by the applicable statute of limitations. *Id.* The court reasoned that the legislature had "spoken to [the] issue" because the session law enacting the new criminal code had stated, in part,

> The provisions of this act do not apply to or govern the construction of and punishment for any offense committed before the effective date of this act, or the construction and application of any defense to a prosecution for such an offense. Such an offense must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner as if this act had not been enacted.

*Id.* (quoting 1977 Ariz. Sess. Laws, ch. 142, § 179 (hereinafter, "Section 179")). The court identified Section 179 as a clear direction "that the new criminal code shall only operate prospectively." *Id.* The court further observed that given the legislature's explicit instruction, "[a]ny inquiry into the technical nature of the statute of limitations is simply not relevant" and nothing indicated that the legislature intended "the new seven-year statute of limitations to apply retroactively." *Id.* Additionally, the court remarked that its interpretation was consistent with the purpose of criminal statutes of limitations as described above—to "protect the accused from the burden of defending himself against charges of long completed misconduct." *Id.* (quoting *Fogel*, 16 Ariz. App. at 248).

¶16        As explained above, § 13-107 was amended in 1997 to include subsection (E). 1997 Ariz. Sess. Laws, ch. 135, § 1; *see also Escobar-Mendez*, 195 Ariz. 194, n.6 ("limitation period does not begin to run if the identity of the person who commits a 'serious offense' . . . is unknown"). Two years later, we stated, in a footnote citing *Martin*, that the 1997 "revision [did] not apply" to a defendant's crimes committed between 1984 and 1987 because "statutes of limitations only apply to offenses committed after their adoption." *Escobar-Mendez*, 195 Ariz. 194, ¶¶ 3, 19, 22-23 & n.6 (considering whether the state had exercised reasonable diligence in discovering defendant's crimes). Subsequently, in *Jackson*, we relied on *Martin* and *Escobar-Mendez* in accepting the state's concession that the 1997 amendment did not impact the defendant's case. 208 Ariz. 56, n.3. Both references to the 1997 amendment in those cases were dicta. *See Escobar-Mendez*, 195 Ariz. 194, ¶¶ 14, 21 & n.6 (law enforcement was reasonably diligent in discovering defendant's crimes in 1994 and indictment ten months later was timely); *Jackson*, 208 Ariz. 56, n.3 (amendment irrelevant because defendant's identity known in 1994).

¶17        In 2006, citing *Martin*, *Escobar-Mendez*, and *Jackson*, we again agreed with the state's concession that the 1997 amendment did not extend the statute of limitations for serious crimes committed in 1994. *Taylor*, 214 Ariz. 40, ¶¶ 8-9 & n.7 (also relying on § 1-244, stating no statute is retroactive unless so expressly declared). In *Taylor*, we granted relief to petitioners Taylor and Johnson, who had each filed a special-action petition from the trial courts' respective denials of their motions to dismiss. *Id.* ¶ 1. Taylor had allegedly committed multiple felonies in June 1994, but the trial court found his identity could not have reasonably been discovered until May 2000. *Id.* ¶¶ 3-4. He was indicted in February 2006. *Id.* Similarly, Johnson had allegedly committed multiple felonies in April 1994, but his identity was not discovered until February 2006. *Id.* ¶ 6. He was indicted in March 2006. *Id.* The trial courts in both cases determined the statute of limitations began to run when the state discovered, or could have reasonably discovered, the defendants' identities, and thus concluded the prosecutions were timely. *Id.* ¶¶ 4, 7.

¶18        In the special-action proceeding, as explained above, we agreed with the parties' assessment that the 1994 statute of limitations was applicable, but the issue was whether that statute "requires discovery of an offense or discovery of the offender." *Id.* ¶¶ 8, 13 & n.7. We concluded the statute of limitations in the 1994 version of § 13-107 ran from "the time the state either discovered or, with the exercise of reasonable diligence should

have discovered, that an offense had been committed" and granted relief to the petitioners. *Id.* ¶¶ 27, 29.

**¶19**　　　Then, in 2007, a different division of this court decided *Gum*. 214 Ariz. 397. Two women were sexually assaulted in 1991. *Id.* ¶ 2. Gum, the assailant, was not identified until 2004 and was indicted within months. *Id.* ¶¶ 3-4. Gum pled guilty to the offenses and in a subsequent Rule 32, Ariz. R. Crim. P., proceeding argued his prosecution was barred by the statute of limitations. *Id.* ¶¶ 4-5.

**¶20**　　　The *Gum* court "agree[d] with *Taylor*'s holding that the applicable limitations period begins to run upon discovery of the offense and not upon discovery of the offender" but concluded "the 1997 amendment to § 13-107 extended the limitations period, and thus Gum's prosecution was not time-barred." *Id.* ¶ 11. Through extensive constitutional, common law, and statutory analysis, the *Gum* court explained that application of the 1997 amendment "to cases in which the existing limitations period had not yet expired on the amendment's effective date" is not an impermissible retroactive application of law under § 1-244 nor is it ex post facto under the United States and Arizona Constitutions. *Id.* ¶¶ 13-29. *Gum* distinguished *Martin* stating that the result there was "based solely on the fact that the legislature had specifically expressed its intent that the new statutes apply only to crimes committed on or after their effective date" and that the *Martin* court "did not decide the issue of ex post facto or retroactivity presented in this case." *Id.* ¶ 21. The *Gum* court also characterized *Jackson*'s and *Escobar-Mendez*'s reliance on *Martin* as "overly broad." *Id.*

**¶21**　　　We subsequently followed *Gum* in *State v. Aguilar*. 218 Ariz. 25. In *Aguilar*, the state appealed the trial court's dismissal of the sexual assault, kidnapping, sexual abuse, and second-degree burglary charges against the defendant, Aguilar. *Id.* ¶ 5. The central issue on appeal was whether the court had erred by applying a "reasonable-diligence standard" to the state's identification of Aguilar. *Id.* ¶ 2. The state also argued, however, that the court erred by failing to apply the 1997 amendment to Aguilar's crimes which were committed in 1993, but for which his identity was not discovered until 2006—the same year he was indicted. *Id.* ¶¶ 4-5, 13.

**¶22**　　　Relying on *Taylor* and *Gum*, we determined the trial court was correct in concluding the statute of limitations began to run in 1993 when the state discovered Aguilar's crimes. *Id.* ¶ 20. And because the 1997 amendment only applies to "serious offenses," which did not statutorily

include sexual abuse and second-degree burglary, we affirmed the dismissal of those charges. *Id.*

**¶23** But we further determined that under *Gum*, "§ 13-107(E) at least applies to toll the limitations period as of the subsection's effective date" and, therefore, Aguilar's prosecutions for sexual assault and kidnapping were not time-barred. *Id.* ¶¶ 22, 25, 51. Aguilar argued *Gum* was wrongly decided, but we rejected his argument, concluding *Gum* was "wholly consistent with retroactivity principles recognized in Arizona and elsewhere" and not contrary to *Martin*. *Id.* ¶¶ 23, 35, 39. Applying *Gum*, we also rejected Aguilar's argument that application of the 1997 amendment violated ex post facto principles. *Id.* ¶ 42.

## B. Analysis

**¶24** As he did before the trial court, Vergara argues that based on our supreme court's opinion in *Martin* and this court's opinions in *Taylor*, *Escobar-Mendez*, and *Jackson*, the 1997 amendment does not apply and the statute of limitations applicable to his crimes expired on December 21, 1998. He asserts that, for various reasons, this court wrongly decided *Gum* and *Aguilar* and we should reject them. The state counters that *Gum* and *Aguilar* were correctly decided, are not contrary to *Martin*, and the 1997 amendment applies to Vergara's offenses.

**¶25** Vergara does not meaningfully challenge *Gum*'s suggestion and *Aguilar*'s conclusion that § 13-107(E) constitutes a procedural change in the law and therefore does not raise retroactivity concerns. *See Aguilar*, 218 Ariz. 25, ¶ 27 ("even if application of § 13-107(E) . . . results in the statute being given retroactive effect, Arizona law would not necessarily prohibit it" because procedural enactments may be applied retroactively). On this ground alone we could conclude Vergara's arguments concerning the alleged improper retroactive application of § 13-107(E) fail. *See id.* We nevertheless address Vergara's arguments, conscious that although we are not "absolutely bound" by prior opinions of this court, we will adopt their reasonings and results unless the opinions rest "upon clearly erroneous principles, or conditions have changed so as to render [them] inapplicable." *Id.* ¶ 23 (quoting *Danielson v. Evans*, 201 Ariz. 401, ¶ 28 (App. 2001)).

**¶26** Vergara first argues § 13-107(E) cannot apply retroactively because the legislature did not so expressly provide. *See* § 1-244 ("No statute is retroactive unless expressly declared therein."); *see also Garcia v. Browning*, 214 Ariz. 250, ¶ 19 (2007) (Section 1-244 "plainly requires an express declaration from the legislature" before retroactive application.). In

*Aguilar*, we rejected the defendant's similar argument that *Gum* had applied § 13-107(E) retroactively in contravention of § 1-244. 218 Ariz. 25, ¶ 23. We explained that a statute is not necessarily applied retroactively just because it relates to antecedent facts. *Id.* ¶ 25. Rather, a statute is applied retroactively if it "disturb[s] vested substantive rights by retroactively changing the law that applies to completed events." *Id.* (quoting *San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, ¶ 15 (1999)).

**¶27** Section 13-107(E) is not substantive because it does not "alter the elements of an offense, redefine a crime or substantive defense in some other manner, reallocate burdens of proof, or otherwise affect a substantive right such as the length or type of punishment that might be imposed for prior conduct." *Id.* ¶ 26. And if the applicable limitations period has not yet expired, a defendant has no "vested, substantive right to any fixed or unchangeable statute of limitations" because he cannot assert a valid limitations defense at that time. *Id.* The seven-year limitations period in Vergara's case had not expired at the time § 13-107(E) became effective, and, consequently, applying § 13-107(E) here is not retroactive and does not implicate § 1-244.[4] *See id.* ¶¶ 23-26; *see also Gum*, 214 Ariz. 397, ¶¶ 27-28.

**¶28** Quoting *Hall v. A.N.R. Freight System, Inc.*, 149 Ariz. 130, 140 (1986), Vergara argues *Gum* and *Aguilar* "failed to recognize . . . that a right does not only vest 'when it is actually assertable as a legal cause of action or defense,' but a right may also fully vest when it 'is so substantially relied upon that retroactive divestiture would be manifestly unjust.'"[5] But Vergara fails to explain how he "so substantially relied" upon the pre-1997 statute that an alleged retroactive divestiture would be "manifestly unjust." He simply asserts that it is.

---

[4]For this same reason, we reject Vergara's argument that it "is illogical to assume that [criminal] limitations . . . can be applied retroactively without express say-so," because in civil cases, Arizona law dictated prospective application until 1928 when the legislature expressly changed course. As explained above, application of § 13-107(E) is not retroactive in a case like Vergara's, where the limitation period had not yet run at the time of the amendment. *See Aguilar*, 218 Ariz. 25, ¶¶ 23-26; *Gum*, 214 Ariz. 397, ¶¶ 27-28.

[5]Both *Gum* and *Aguilar* cited *Hall*. *See Gum*, 214 Ariz. 397, ¶ 26; *Aguilar*, 218 Ariz. 25, ¶ 36.

¶29　　　　Assuming *Hall*, a civil tort case, applies, our supreme court there stated that "[a]ny substantial reliance argument raised by a defendant must focus on actual reliance at the time of the litigated occurrence, not upon any subsequent hope or expectation that the law will remain static" until the right vests. *Hall*, 149 Ariz. at 142 n.16. The court determined the defendant had not "substantially relied" on the contributory negligence defense, in part, because, "the existence or lack of such an affirmative defense has no effect on the every day conduct of individuals." *Id.* at 142 (quoting *Godfrey v. State*, 530 P.2d 630, 632 (Wash. 1975)).

¶30　　　　Vergara has not asserted, nor do we think he could reasonably argue, that he relied on the statute of limitations in effect when he decided to assault T.M. *See id.* at 142 n.16 ("reliance" must be at time of the occurrence, not a subsequent expectation that the law will stay the same). Moreover, § 13-107(E) does not "regulate primary or any other conduct or attach new legal consequences" to Vergara's offenses. *Aguilar*, 218 Ariz. 25, ¶ 37. We fail to see, and Vergara has not shown, how he "so substantially relied" on the statute in effect in 1991 such that his right had fully vested at that time and "retroactive divestiture would be manifestly unjust."[6] *Hall*, 149 Ariz. at 140.

¶31　　　　Vergara also argues, however, that *Aguilar*'s conclusion that § 13-107(E) does not regulate primary conduct was erroneous. 218 Ariz. 25, ¶ 37. He contends the conclusion is based on flawed reliance on caselaw from other jurisdictions and is contrary to the analysis in *Martin*. We disagree.

¶32　　　　Criminal offenses underlying a prosecution are an example of "primary conduct," whereas the state's filing of those charges is an example of "secondary conduct." *Aguilar*, 218 Ariz. 25, ¶ 31 (quoting *Cook v. Stegall*, 295 F.3d 517, 520 (6th Cir. 2002)); *cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 291 (1994) (Scalia, J., concurring) (in considering retroactivity, "[t]he critical issue . . . is not whether the rule affects 'vested rights,' or governs substance

---

　　　　[6]Without citation to legal authority, Vergara argues that regardless of whether rights are fully vested, because § 13-107 "begins to operate with the discovery of the offense, applying statutory amendments to offenses committed before the amendment went into effect constitutes retroactive application." But, as we have previously observed, the test for retroactivity is when a limitations period vests, not when it begins to run. *See Aguilar*, 218 Ariz. 25, ¶ 25 (statute retroactive if it "disturb[s] vested substantive rights," not merely if it relates to antecedent facts).

or procedure, but rather what is the relevant activity that the rule regulates"). In *Aguilar*, to determine whether § 13-107(E) regulated primary or secondary conduct, we first looked to our supreme court. *Id.* ¶ 29. We noted that in *Garcia*, to determine whether a statute was impermissibly applied retroactively, our supreme court "implicitly differentiated primary from secondary conduct," by citing Justice Scalia's concurrence in *Landgraf*. *See Aguilar*, 218 Ariz. 25, ¶¶ 29-30; *Garcia*, 214 Ariz. 250, ¶ 14 ("Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date." (quoting *Landgraf*, 511 U.S. at 291 (Scalia, J., concurring))). We further observed that statutes of limitations were like the procedural laws that the majority in *Landgraf* had concluded "regulate secondary rather than primary conduct" and do not, therefore, pose retroactivity concerns. *Aguilar*, 218 Ariz. 25, ¶ 30 (quoting *Landgraf*, 511 U.S. at 275). Vergara fails to give due weight to our consideration of Arizona and United States Supreme Court law in *Aguilar*. *See id.* ¶¶ 29-30.

¶33        And although we continued on to consider other jurisdictions that had "addressed retroactivity questions in the context of newly enacted statutes of limitations" and, consistent with those authorities, concluded § 13-107(E) regulates secondary conduct, we are not persuaded that such a conclusion was clearly erroneous. *Id.* ¶¶ 23, 31. Vergara argues such reliance was improper because Arizona, "consistent with a minority position, construes its statute of limitations differently — the protections are jurisdictional and designed to protect the accused from stale prosecutions." Although we have characterized criminal statutes of limitations in Arizona as "jurisdictional," *see Fogel*, 16 Ariz. App. at 248, we explained in *Jackson* that "§ 13-107 relates only to time limitations and says nothing about jurisdiction," and noted the "jurisdictional" characterization has been questioned and rejected by other courts, 208 Ariz. 56, ¶ 19 & n.11; *see also Musacchio v. United States*, 577 U.S. 237, 246 (2016) (statutes of limitations are not usually jurisdictional unless legislative body clearly says they are). We further stated that, in any event, "we do not necessarily equate a statute-of-limitation issue with . . . pure, territorial jurisdiction." *Jackson*, 208 Ariz. 56, ¶ 20. Vergara has not explained how § 13-107(E) being "jurisdictional" affects whether the statute regulates primary versus secondary conduct. Jurisdiction does not necessarily affect whether a statute is procedural or substantive, *Aguilar*, 218 Ariz. 25, ¶¶ 28, 31, and we similarly fail to see how it affects what conduct § 13-107(E) regulates.

¶34        Vergara also argues the conclusion that § 13-107(E) regulates secondary conduct is contrary to our supreme court's interpretation in

*Martin* of Section 179 of the new criminal code. He asserts that if a criminal statute of limitations does not regulate primary conduct, then *Martin* should not have applied Section 179 in its retroactivity analysis because Section 179, by its plain language, only applied to statutes regulating primary conduct. *See* 135 Ariz. at 100 (quoting 1977 Ariz. Sess. Laws, ch. 142, § 179) ("The provisions of this act shall govern the construction of and punishment for any offense defined in this act and committed after its effective date" and, unless otherwise provided or required, must also "govern the construction of and punishment for any offense defined outside this act and committed after its effective date." The provisions of the act "do not apply to or govern the construction of and punishment for any offense committed before the effective date of this act, or the construction and application of any defense to a prosecution for such an offense."). He therefore argues that, under *Martin*, a statute of limitations must regulate primary conduct.

¶35 But the *Martin* court was not required to consider the issue of whether Section 179 applied to primary or secondary conduct. In fact, it specifically noted that "[a]ny inquiry into the technical nature of the statute of limitations is simply not relevant," because the plain language of Section 179 directed the amendment to "only operate prospectively."[7] *Id.*; *see* 1977 Ariz. Sess. Laws, ch. 142, § 179 (offense committed before effective date of new criminal code "must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner *as if this act had not been enacted*" (emphasis added)). No such plain language existed in the 1997 amendment, *see* 1997 Ariz. Sess. Laws, ch. 135, § 1; *Gum*, 214 Ariz. 397, ¶ 20, necessitating our court's further inquiry into

---

[7]Vergara further argues that *Gum* erroneously stated that *Martin* "looked no further than the language of the new code." Vergara asserts this fails to acknowledge that *Martin* relied on more than just the language of the new code. *See* 135 Ariz. at 100. But, as shown above, we agree with *Gum* that *Martin*'s analysis did not go beyond the plain language of the new code. Rather, our supreme court rejected the state's argument that the statute of limitations is purely procedural as "specious" because it was irrelevant. *Id.* It further stated nothing indicated a contrary intent to that plainly stated in Section 179, the language of which was also consistent with the purpose of criminal statutes of limitations. *Id.* These additional analyses served only to bolster the *Martin* court's plain-language interpretation; they were not separate grounds on which it based its conclusion. *See id.*

the accuracy of *Gum*'s conclusion that the 1997 addition of § 13-107(E) did not regulate primary conduct, *Aguilar*, 218 Ariz. 25, ¶¶ 29-33, 38-39 (citing *Gum*, 214 Ariz. 397, ¶ 27). We are not persuaded that this conclusion is contrary to *Martin*, nor are we otherwise persuaded that the trial court erred by relying on *Aguilar* and *Gum* to conclude the 1997 amendment applies to Vergara's offenses.

## II. Tolling of the Statute of Limitations

¶36 Vergara argues that his prosecutions for kidnapping and aggravated assault with a deadly weapon or dangerous instrument were nevertheless time barred because the 1997 amendment tolled the statute of limitations, it did not extend it. He therefore maintains he was "entitled to receive credit against the limitation period for the five years and seven months before the 1997 amendment went into effect." Under his asserted framework, after his identity was discovered in December 2018, the state had seventeen months to obtain an indictment before the limitations period ran on May 6, 2020 and, thus, his indictment on April 20, 2021 was impermissible.

¶37 In *Aguilar*, we agreed with the state that "under *Gum*, § 13-107(E) at least applies to toll the limitations period as of the subsection's effective date." 218 Ariz. 25, ¶ 22. Although we did not need to reach it to resolve that case, we nevertheless observed that the 1997 amendment arguably "provided a new, seven-year 'period of limitation' that was unaffected by the time between the date the offenses were committed and the amendment's effective date." *Id.* n.7. "In other words, the limitations period arguably did not start to run until the identity of the person who allegedly had committed the offenses was known." *Id.*

¶38 "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *State v. Hansen*, 215 Ariz. 287, ¶ 7 (2007). Therefore, we apply the plain text of an unambiguous statutory provision. *State v. Agundez-Martinez*, 256 Ariz. 445, ¶ 10 (2024). Vergara concedes that the legislature did not use the word "toll" in § 13-107(E). But he argues the amendment could not have "extended" the limitations period because "[t]o 'extend' is 'to add to something in order to make it . . . longer,'" (quoting *Extend*, Cambridge Dictionary, https://dictionary.cambridge.org (last visited Mar. 28, 2024)) and "regardless of knowledge of identity or lack thereof, the limitation period for the offenses included in subsection (E) was still seven years."

¶39        The plain language of § 13-107(E) does not support Vergara's argument.  Section 13-107(E) states that "[t]he period of limitation *does not run* for a serious offense . . . during any time when the identity of the person who commits the . . . offenses is unknown."  (Emphasis added.)  We have already concluded § 13-107(E) applies to Vergara's offenses.  Vergara's identity was unknown until December 6, 2018 when he was identified through the DNA "hit to a database."  The limitations period "[did] not run" for the serious offenses he had committed during the time his identity was unknown.  § 13-107(E).  Accordingly, beginning December 6, 2018, the state had seven years to charge Vergara, *see* § 13-107(B), and it did so within three years.  The prosecution for all of Vergara's offenses was timely.

¶40        Vergara nevertheless argues that even if the plain language of § 13-107(E) does not support his tolling theory, his "time credit" argument is supported by A.R.S. § 1-250.  There, our legislature directed that, generally, when a limitations period has started running "before an act repealing such law takes effect . . . the time which has already run shall be deemed part of the time prescribed as such limitation . . . ."  *Id.*  Vergara argues § 13-107(E) "constitutes a repeal" of "the seven-year limitation for all class two serious offenses where identity was unknown."

¶41        "Legislatures are presumed to enact statutes compatible with existing legislation."  *State v. O'Brien*, 123 Ariz. 578, 583 (App. 1979).  We have a duty to harmonize statutory provisions and "will not construe a statute as repealed by implication if [we] can avoid doing so."  *State ex rel. Purcell v. Superior Court*, 107 Ariz. 224, 227 (1971); *see also State v. Torrez*, 141 Ariz. 537, 539 (App. 1984) (implicit repeal is not favored unless clear that two statutes are inherently inconsistent).  If two statutory provisions can be harmonized, a specific, more narrow statutory provision does not replace an earlier, more general one.  *O'Brien*, 123 Ariz. at 583; *see also State v. Cassius*, 110 Ariz. 485, 487 (1974) ("Where a statute first expresses a general intent, and later an inconsistent particular intent, such particular intent will be taken as an exception to the general intent, and both will stand.").

¶42        The 1997 addition of § 13-107(E) did not repeal § 13-107(B).  It merely added a more specific provision for when the identity of the perpetrator of a serious crime is unknown.  *See* 1997 Ariz. Sess. Laws, ch. 135, § 1.  Generally, the limitations period for kidnapping and aggravated assault with a deadly weapon or dangerous instrument is seven years from discovery of the offense, *see Gum*, 214 Ariz. 397, ¶ 11, but, specifically, when the assailant is unknown, the limitations period "does not run," § 13-107(E); *see also* A.R.S. §§ 13-706(F)(1)(d), (j), 13-1204(A)(2), (E)

(aggravated assault with deadly weapon or dangerous instrument), 13-1304(B) (kidnapping). The two subsections in § 13-107 are not inherently inconsistent,[8] but even if we assumed they are, subsection (E) is merely an exception to subsection (B). *See Cassius*, 110 Ariz. at 487. There was no repeal, implicit or otherwise, and thus, § 1-250 does not apply. The trial court did not abuse its discretion in denying Vergara's motion to dismiss the charges against him.[9]

### Database Hit

**¶43** Vergara next asserts the trial court committed reversible error when it denied his requests to preclude evidence that he became a suspect because his DNA "hit to a database." He argues this evidence impermissibly implied he had a prior criminal history which violated his constitutional right to a fair trial. We review for an abuse of discretion the admissibility of evidence, *State v. Rose*, 231 Ariz. 500, ¶ 59 (2013), and review alleged constitutional violations de novo, *State v. McGill*, 213 Ariz. 147, ¶ 53 (2006).

### I. Background

**¶44** Before his first trial, Vergara moved to preclude any evidence that his DNA was "in a statewide database" and that the information from that database matched the DNA profile developed from T.M.'s vaginal swab. Among other things, he argued the only relevance of this evidence was to show how he became a suspect, which was not an element the state had to prove. While he acknowledged other states seemed to permit this type of evidence, he asserted that those courts had failed to properly consider the danger of unfair prejudice to the defendant and that although "the DNA profile in the database does not directly reveal a prior conviction, the fact of its existence raises an impermissible inference." The state

---

[8]They are also not inherently inconsistent because the running of a limitations period for a non-serious offense in subsection (B) is wholly unaffected by subsection (E). § 13-107; *see also Aguilar*, 218 Ariz. 25, ¶ 20 (dismissing defendant's non-serious offenses for which the statute of limitations had expired long before the indictment).

[9]Given our disposition, we need not reach Vergara's additional argument that he is entitled to a new trial or resentencing because evidence of and verdict forms for the kidnapping and aggravated assault were improperly admitted in violation of Rule 404, Ariz. R. Evid.

responded that no Arizona authority prohibited the introduction of such evidence and that other states seemed to "weigh decidedly in favor of permitting the State to explain . . . why investigators went from having no suspects to focusing on a single individual." The state avowed that it would not introduce any evidence regarding the source of the DNA or the name of the database, "CODIS."[10]

¶45 After a hearing, the trial court denied the motion "given the State's . . . avowal that the CODIS database is not going to be named by name, and that the only evidence that would be introduced would be that his DNA was in a database." The court also found the evidence had probative value and that value was not substantially outweighed by the danger of unfair prejudice. *See* Ariz. R. Evid. 403.

¶46 After the mistrial, Vergara asked the trial court to reconsider its prior ruling. The court, finding no good cause to reconsider, affirmed its prior ruling allowing mention of a database without reference to a "government data base or CODIS."

¶47 In its opening statement, the state told the jury that after law enforcement had obtained "a major male profile" from the sexual assault kit, they "managed to get a hit from a database that led them to consider Albert Vergara as a possible suspect." The following day, the state asked a detective if he had "a hit to a database that gave [him] the name of Albert Vergara as a possible person to look into," to which he responded "Yes." The state later asked the same detective if, "given that some of these cases are assigned . . . after a preliminary DNA hit has occurred," whether "that hit is confirmed through further DNA analysis."

¶48 The state also questioned a criminalist who, in 2018, had generated a report on T.M.'s sexual assault kit. She described that generally, an outside lab would do the DNA analysis and after reviewing that lab's report she would "decide if it was suitable to put into a database." If there "was a hit to the profile," she would send that to the detective. Specifically in Vergara's case, the criminalist stated that she had to review the outside lab's report "to be allowed to put it in the database."

---

[10]CODIS stands for "Combined DNA Index System." *Taylor*, 214 Ariz. 40, ¶ 3. It is a national database utilized by law enforcement. *Id.*; *State v. Mitcham*, ___ Ariz. ___, ¶ 5, 559 P.3d 1099 (2024).

¶49 After this questioning, Vergara asked the trial court to instruct the state to not mention the database hit again. The state asserted that it would not ask any more questions related to the database. On that avowal, the court stated that it would not "enter a formal order," but reminded the state to "keep it in mind."

¶50 Thereafter, the state called another detective, and although that detective did not testify to any "database hit," jurors submitted the following questions after his testimony: (1) "For DNA 'hits' or a match how are the original hits generated?"; (2) "For (Albert Vergara) was his DNA on file with [the police department] or a hospital, e[tc.] . . ."; (3) "When there is a DNA match from evidence collection, what database is being used to find that match?"; (4) "How is that database built?"; (5) "Does a person have to have been a suspect in a previous crime to have their DNA added to this database?"

¶51 Based on these questions, Vergara moved for a mistrial. He argued "the jury is wondering" and there is already "at least one juror who is believing that [he] has been involved in criminal conduct before." The state responded that the questions showed that the jury was "not assuming that he is a suspect" in other crimes because one of the questions referred to DNA being on file with a hospital. The state further suggested that it could ask the detective whether someone had to be a suspect to be in the database, to which the answer would be "no."

¶52 The trial court denied Vergara's motion for mistrial. The court reasoned that the state had not violated its previous ruling and that while the jury "may be wondering about the database, they're not making any conclusions as to what database it might come from." It further observed that there are many databases and, based off the juror's question, the jury is aware of them. The court asked Vergara if he would like to take the state's suggested approach of further questioning the detective. Vergara declined, asserting that "trying to fix it" may create a "cloud of suspicion," and solely asked that the state not refer to the database again. The court did not ask the jurors' questions as described above, and it ordered the state not to refer to the database again.

¶53 Later that day, when discussing the process of DNA analysis, the criminalist testified that at the end of the process, "you end up with, basically, a list of numbers" which can then be "compare[d] to other samples or put in a database and . . . searched against other profiles." When asked if she did additional work on Vergara's case after reviewing the outside lab's report, the criminalist said "I entered the profile into—."

Vergara objected and again asked for a mistrial. The trial court sustained the objection.

**¶54**        Jurors again submitted questions related to the database after the criminalist's testimony: (1) "What data base is it that contains the DNA profiles?"; (2) "How are DNA profiles matched?"; (3) "How do you go about making a match from the 'profile' to the sample of DNA given by the suspect?"; (4) "What data base was checked to find any possible DNA match?"; (5) "Where do samples for this data base come from?"; (6) "How large is the pool of people that this type of DNA testing uses when searching for a match?"[11] Vergara again argued the jury was "continuing to wonder" about the database. In response, the trial court stated "the limiting instruction is good enough to handle it because they're told not to consider it." The court did not ask the criminalist any of the jurors' questions related to the database. And, at the end of trial, the court instructed the jury, "You have heard evidence that a preliminary DNA profile for Mr. Vergara was contained in a database. This evidence is admitted for the limited purpose of explaining why Mr. Vergara became a subject in 2018 and, therefore, you must consider it for that limited purpose and not for any other purpose." The jurors were also instructed that they "must not speculate or guess about any fact."

## II. Analysis

**¶55**        On appeal, Vergara argues the evidence related to the database was "irrelevant and overly prejudicial" and violated his right to a fair trial under the United States and Arizona Constitutions. He further argues it was improper evidence of other acts. The state counters that the evidence was relevant and not outweighed by a danger of unfair prejudice and was not other-acts evidence.

### A. Relevance

**¶56**        Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Ariz. R. Evid. 401; *see also State v. Leteve*, 237 Ariz. 516, ¶ 48 (2015) ("The threshold for relevance is a low one."). Relevant evidence is generally admissible unless otherwise prohibited by constitution, statute, or rules; irrelevant evidence is never admissible. Ariz. R. Evid. 402. Evidence can

---

[11]Additionally, there was a question that was crossed-out that had stated, "What database did the DNA sample get a hit out of?"

be relevant if it rebuts a defense. *See State v. Hargrave*, 225 Ariz. 1, ¶¶ 3, 6, 20, 22 (2010), *abrogated on other grounds by Cruz v. Arizona*, 598 U.S. 17, n.1 (2023) (evidence of co-defendant's guns found at defendant's campsite was relevant to rebut defendant's main defense that he did not know his co-defendant would have a gun during robbery).

¶57        Vergara argues the database evidence did not have any tendency to prove that he was the perpetrator of the offenses because "the relevant DNA comparison and match was between the known profile obtained from [his] buccal cells and the profile obtained from [T.M.'s] vaginal swatches." But Vergara fails to acknowledge the evidence was relevant to rebut his defense and argument to the jury that law enforcement wanted to "pin" the offenses on him because of "a DNA profile." Vergara further argued that within the nearly "30-year period" of investigation there were "discrepancies, and really troubling facts" that had led to a false accusation. Evidence that Vergara's DNA "hit to a database" had a tendency to rebut this defense by showing how law enforcement came to suspect him nearly twenty-seven years after the offenses. *See Hargrave*, 225 Ariz. 1, ¶ 22; *People v. Jackson*, 903 N.E.2d 388, 397-99 (Ill. 2009) (evidence of defendant's DNA in a database was relevant to show how authorities identified him six years after murder).

### B. Unfair prejudice

¶58        Relevant evidence can still be excluded, however, if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis . . . such as emotion, sympathy or horror." *State v. Riley*, 248 Ariz. 154, ¶ 70 (2020) (quoting *State v. Schurz*, 176 Ariz. 46, 52 (1993)). Just because evidence is harmful to the defendant does not necessarily make it unfairly prejudicial. *Schurz*, 176 Ariz. at 52. "Trial courts have considerable discretion in deciding whether to exclude evidence under [Rule 403]." *State v. Cooperman*, 232 Ariz. 347, ¶ 17 (2013).

¶59        The fact that Vergara's DNA was in a database did not have an "undue tendency to suggest [a] decision" on "emotion, sympathy or horror." *Riley*, 248 Ariz. 154, ¶ 70 (quoting *Schurz*, 176 Ariz. at 52). But Vergara argues the evidence nevertheless "carried a danger of unfair prejudice because . . . it is common knowledge that criminals have their DNA put into databases" and testimony related to a DNA database

implicitly introduced "bad character evidence and inadmissible other act evidence."[12]

**¶60** Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b)(1). In other words, evidence cannot be admitted to show that "because a defendant did one bad act, he likely engaged in other bad acts," but the trial court may admit such evidence for other, non-propensity purposes. *State v. Payne*, 233 Ariz. 484, ¶ 58 (2013); *see also* Ariz. R. Evid. 404(b)(2). If other-act evidence is admissible but prejudicial, the court must "limit the evidence to its probative essence . . . by excluding irrelevant or inflammatory detail." *Payne*, 233 Ariz. 484, ¶ 58 (quoting *State v. Hughes*, 189 Ariz. 62, 70 (1997)).

**¶61** As explained above, the criminalist testified that, specifically in Vergara's case, she had to review the report of the outside lab's analysis of the sexual assault kit "to be allowed to put it in the database." This statement came after she had already testified that, generally, she would review an outside lab's report, "decide if it was suitable to put into a database," and then, if there "was a hit to the profile," she would send that to a detective. Additionally, the detective testified that he had "a hit to a database that gave [him] the name of Albert Vergara as a possible person to look into" as a suspect, and the prosecutor asked him about confirmatory DNA analysis "given that some of these cases are assigned . . . after a preliminary DNA hit has occurred." Taken together, the evidence could have reasonably suggested the database related to criminal investigations.

**¶62** But the trial court sanitized the evidence by prohibiting the state from referring to a "government data base or CODIS," and, consistent with that order, there was no mention of how Vergara's DNA ended up in the database or what the name or purpose of the database was. *See Payne*, 233 Ariz. 484, ¶ 58 (court must exclude irrelevant or inflammatory details of otherwise probative evidence). As the court observed, there are various databases which could contain DNA. Many of the jurors' questions indicated awareness of this by asking which DNA database was used, if

---

[12]Vergara and the state dispute whether the other-acts argument was properly preserved for our review. We need not reach this issue because we conclude there was no error. *See State v. Montoya*, ___ Ariz. ___, ¶ 14, 554 P.3d 473, 488 (2024) ("We need not decide if [the defendant's] objection was sufficient to preserve this issue for harmless error analysis. The prosecutor did not commit error.").

someone had to be involved in a crime to be in the database, and if the database was through law enforcement or a hospital. And even assuming the testimony suggested that Vergara had involvement in a prior crime, wrong, or act—it was not presented to show he acted "in conformity therewith." Ariz. R. Evid. 404(b). No specific prior crime, wrong, or act was even presented. *See State v. Connor*, 215 Ariz. 553, ¶ 32 (App. 2007) ("Rule 404(b) only precludes evidence that is offered to show the character of a defendant to prove disposition to acts of a particular type."). Nor was his role in, or extent of involvement in, a prior crime, wrong, or act revealed. *See id.* The database evidence was solely used to show why Vergara became a suspect decades later and to explain the criminalist's steps in processing reports received from outside labs. Such was not improper propensity evidence, and we cannot say the court abused its broad discretion under Rule 403. *See Cooperman*, 232 Ariz. 347, ¶ 17.

**¶63** We further observe that Vergara declined the trial court's offer for the state's witness to clarify that a person did not have to be a suspect to be in the database, which would have stymied any asserted prejudice. In any event, the court later instructed the jury that it "must not speculate or guess about any fact" and that it could only consider the database evidence for the "limited purpose of explaining why Mr. Vergara became a suspect in 2018 . . . and not for any other purpose." "We presume jurors follow the court's instructions," *State v. Newell*, 212 Ariz. 389, ¶ 69 (2006), and we will not reverse based on "vague references to other unproven crimes" with an appropriate limiting instruction, *State v. Jones*, 197 Ariz. 290, ¶ 34 (2000).

## Disposition

**¶64** For the foregoing reasons, we affirm Vergara's convictions and sentences.